[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 2, 2010
JOHN LEY
CLERK

_____

No. 08-16665

_____

D. C. Docket No. 06-01921-CV-T-30-EAJ

TODD LATIMER,

Plaintiff-Appellant,

versus

ROARING TOYZ, INC.,
a Florida corporation, et al.,

Defendants,

KAWASAKI MOTORS CORP, USA,
a foreign corporation,
HACHETTE FILIPACCHI MEDIA U.S., INC.,
a foreign corporation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 2, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

FAY, Circuit Judge:

This appeal arises out of an intellectual property dispute between a professional photographer and multiple defendants regarding the distribution and publication of photographs of a customized motorcycle. Todd Latimer sued Kawasaki Motors Corp., U.S.A. ("Kawasaki"), Hachette Filipacchi Media U.S., Inc. ("Hachette"), Roaring Toyz, Inc. ("Roaring Toyz"), and Robert Fisher for copyright infringement and unfair competition, alleging that defendants copied and used his protected work without permission or authorization. Defendants maintain they were permitted to use the photographs and, as unauthorized derivative works, the photographs fail to qualify for copyright protection. The district court granted summary judgment to all defendants on the unfair competition claim and to Kawasaki and Hachette on the copyright infringement claims. The district court held that (1) Latimer's unfair competition claim is preempted by the Copyright Act,[1] (2) the photographs are not unauthorized derivative works and thus they qualify for copyright protection, (3) Latimer granted Kawasaki an implied license to use the photographs in its press release materials, and (4) Hachette's subsequent publication of the photographs was fair use. We affirm in part and reverse in part.

_____

[1]This ruling is not challenged on appeal.

2

# I. BACKGROUND

*A. Factual Background*

We state the facts in the light most favorable to the non-moving party, plaintiff-appellant Todd Latimer, as required by the law controlling summary judgment.

Todd Latimer is a professional photographer who specializes in motorcycle photography. Latimer's passion for motorcycles and background in glamour and fashion photography helped him develop a reputation as a respected motorcycle photographer. Latimer is known for portraying motorcycles in a unique and artistic style. Latimer's photographs have appeared on the covers of motorcycle enthusiast magazines such as *Two Wheel Tuner*, *Super Street Bike*, and *Cycle Scene*.

In late 2004 or early 2005, Latimer was introduced to Roaring Toyz by his friend and Roaring Toyz employee, Bruce Casner. Roaring Toyz is a Florida based company that specializes in customizing sport motorcycles and manufacturing aftermarket[2] parts for the same. Casner was familiar with Latimer's work and approached him to photograph aftermarket parts for a Roaring Toyz

---

[2]Aftermarket is defined as "the market for parts and accessories for a manufactured article (as an automobile) for repair and replacement as distinguished from the use of such parts as original components." *Webster's Third New International Dictionary* 38 (3d ed. 1966).

3

catalog. Several months later, Casner hired Latimer to help with the Roaring Toyz booth at the West Palm Beach Motorcycle Show. Casner arranged for models to appear in the booth and Latimer conducted several photo shoots during the show to generate interest in the Roaring Toyz display. During the show Latimer met Roaring Toyz president and founder, Robert Fisher.

In late 2005, Fisher retained John Del Cioppo, owner and operator of Graphics 2, a New Jersey corporation that had recently relocated to Florida, to manage Roaring Toyz websites and advise him on marketing and public relations issues. Prior to Del Cioppo's involvement, Fisher managed Roaring Toyz marketing efforts with assistance from his employees.

Kawasaki, a prominent motorcycle manufacturer, planned to unveil its highly anticipated ZX-14 sport motorcycle at Daytona Bike Week in March 2006. The ZX-14 promised to be the fastest production motorcycle ever built; and as such, news of its release generated a lot of excitement within the motorcycle community. While preparing for the introduction of the ZX-14, Kawasaki noted a trend developing in the marketplace for customized motorcycles. The ZX-14's main competition, the Suzuki Hayabusa, was particularly sought after for customization projects. In addition, many aftermarket parts were readily available for the Hayabusa, which increased it's attractiveness to potential buyers. As a

result, Kawasaki's marketing plan for the ZX-14 focused on the bike's customization potential and availability of aftermarket parts.

In an effort to further their marketing plan, Kawasaki engaged Roaring Toyz to customize two ZX-14 motorcycles. Kawasaki's Director of Product Planning, Patrick Kelly, discovered Roaring Toyz online and was impressed by their work. In January 2006, Kawasaki delivered two pre-production ZX-14 motorcycles to Roaring Toyz. The customized motorcycles were to be delivered to Daytona and displayed alongside the production model ZX-14 during Bike Week. Decisions regarding how the customization should be done, as well as what the final product should look like, were left to Roaring Toyz.

Roaring Toyz customized the mechanical features of motorcycles, leaving paint and body work to outside contractors. As such, Roaring Toyz commissioned Ryan Hathaway, an independent painter, to apply custom paint and graphics to the ZX-14 motorcycles. Hathaway had provided paint services to Roaring Toyz for five or six years, during which he also produced work for other companies and individuals. Fisher and Hathaway discussed graphic styles and color schemes but Hathaway made the final decisions as to the paint design and colors for the ZX-14s. During January and February 2006, Hathaway worked in his one-man shop designing the artwork, selecting the paint colors, and painting the bodywork for the

5

ZX-14 motorcycles.

Meanwhile, Latimer was assigned by *Two Wheel Tuner* magazine to follow Roaring Toyz customization of the ZX-14 motorcycles. Specifically, Latimer's assignment was to provide photographs of the motorcycles at various stages of the customization process for inclusion with a magazine article. As a result of the assignment, Latimer was frequently present at the Roaring Toyz shop photographing the motorcycles. During one of his visits to Roaring Toyz, Latimer was approached by Fisher to photograph several other customized motorcycles for use on the Roaring Toyz website. On February 14 and 16, 2006, Latimer photographed three Yamaha R1s and three Suzuki Hayabusas, as requested by Fisher.

As Roaring Toyz worked to complete the ZX-14 project in time for Daytona Bike Week, Kawasaki was planning the ZX-14 World Press Introduction, to be held in late February 2006 in Las Vegas, Nevada. The ZX-14 World Press Introduction was an important event for Kawasaki and was carefully orchestrated to garner positive media exposure for the motorcycle's release. Kawasaki carefully selected its press invitees with a focus toward motorcycle enthusiast publications. One such publication in attendance was *Cycle World* magazine[3], which is owned

---

[3]*Cycle World* is the largest motorcycle enthusiast magazine with a circulation of over 330,000.

by defendant-appellee Hachette.

As the press event approached, Kawasaki realized that in order to effectively implement its marketing plan, it needed to exhibit the customized ZX-14s to the media. The customized motorcycles were not scheduled to be completed until Daytona Bike Week in early March, and as such would not be available for the ZX-14 World Press Introduction in Las Vegas. Thus, Kawasaki's only alternative was to exhibit photographs of the customized motorcycles.

Kawasaki's public relations firm, Freeman & McCue, contacted Del Cippo to obtain photographs of the customized motorcycles. When Del Cippo responded with unsatisfactory images taken by the Roaring Toyz staff, Freeman McCue pleaded for "usable, reproducible photos" of the motorcycles. On February 23, 2006, Fisher contacted Latimer and explained Kawasaki's urgent request for photographs of the customized ZX-14s. Latimer agreed to conduct a photo shoot that evening to meet Kawasaki's February 24, 2006 deadline as long as he was paid for the photographs taken on February 14 and 16, 2006. Latimer claims that Fisher told him the ZX-14 photographs would be used on a placard to be displayed beside the ZX-14 motorcycles at Daytona Bike Week. However, Fisher and Del Cippo insist that they told Latimer the photographs would be used by Kawasaki for the press release in Las Vegas. Latimer denies being told this by either Fisher or

7

Del Cippo. Latimer also claims that he made it clear to both Fisher and Del Cippo that the photographs could not be leaked before the publication of his article in *Two Wheel Tuner*.

Latimer worked throughout the night of February 23-24 photographing the customized ZX-14s, as requested by Fisher and Del Cippo. The photographs were taken at Roaring Toyz facility since there was only one kick stand for the two motorcycles. Due to the short deadline, Roaring Toyz employees assisted Latimer by running extension cords and power cables for lights and cameras and setting up the background and flooring. However, Latimer made all decisions regarding lighting, appropriate camera equipment and lens, camera settings and use of the white background, which was consistent with the industry practice he had noted in studying other advertising photographs.

When the photo session concluded on the morning of February 24, 2006, Latimer asked to be paid $800.00 for the photographs taken on February 14 and 16, 2006. Fisher gave Latimer a check for $800.00 and in return Latimer gave Fisher a compact disc containing edited images of the three Yamaha R1 and three Suzuki Hayabusa motorcycles. Fisher claims that payment for the R1 and Hayabusa motorcycles was never discussed and that Latimer's payment request pertained to that night's photo session.

8

After arriving home that morning, Latimer began digitally editing the ZX-14 photographs for use on the placard. Later that same morning, Latimer emailed Del Cioppo a selection of edited images of the customized ZX-14 motorcycles. Each of the images Latimer delivered to Del Cioppo contained a metadata[4] file that provided the viewer with technical information and copyright notice for the photograph. Del Cioppo immediately forwarded the images to Kawasaki via email.

Later that day, Del Cioppo informed Latimer that Kawasaki was impressed by the ZX-14 photographs and wanted to include five of his images in its presentation at the press event in Las Vegas, Nevada. Latimer informed Del Cioppo that Kawasaki could use his images of the ZX-14 motorcycles conditioned on Kawasaki giving him credit as the photographer. Latimer claims that he understood Kawasaki's request to be limited to using the photographs in a screen presentation. However, in an email to Del Cioppo on February 24, 2006, Latimer wrote: "Kawasaki will list you guys on the flyer for sure. Please forward my credit info to them so that they might attach it on the back of the flyer, that would be cool. Thanks, Todd."

---

[4]Metadata, commonly described as "data about data," is defined as "[s]econdary data that organize, manage, and facilitate the use and understanding of primary data. *Black's Law Dictionary* 1080 (9th ed. 2009).

9

During the ZX-14 press event, Kawasaki distributed press kits to approximately thirty members of the media, including a representative of *Cycle World* magazine. The press kits contained a selection of digital images on compact disk, including copies of Latimer's ZX-14 photographs, with their respective metadata attached.

Del Cioppo posted Latimer's photographs of the customized ZX-14 motorcycles on two Roaring Toyz websites[5] to promote and advertise the sale of its merchandise and customization services. Del Cioppo also testified that he spoke to a publisher at *Cycle World* about publishing Latimer's photographs of the customized ZX-14 motorcycles. According to Del Cioppo, he "called in some favors and . . . talked to one of the publishers . . . to give him an exclusive, the opportunity to come in and photograph the ZX-14s at Roaring Toyz. He declined." Subsequently, *Cycle World* published three of the five ZX-14 photographs that were included in the press kits distributed by Kawasaki in Las Vegas. The photographs were published in conjunction with a feature article written by Don Canet that appeared in the June 2006 issue of *Cycle World*.

On June 2, 2006, the Register of Copyrights granted Latimer's application for copyright registration of his photographs of the customized ZX-14 motorcycles,

---

[5]www.roaringtoyz.com and www.zx-14parts.com.

under Certificate of Registration No. Vau700-638. Five of these protected works are at issue in this appeal. Latimer claims he learned that his photographs were being used without his permission when he read a copy of the June 2006 issue of *Cycle World* while in a barber shop. Believing that confronting defendants about the unauthorized use of his photographs would be tantamount to "professional suicide," Latimer delayed taking action until August 2006 when he contacted Kawasaki and informed them that his photographs were being used without his permission.

*B. Procedural Background*

In October 2006, Latimer brought this action against defendants alleging federal copyright infringement under 17 U.S.C. § 501 and unfair competition under Florida common law. Latimer specifically alleges that (1) Roaring Toyz used his protected work without authorization by displaying the photographs on its websites to promote and advertise the sale of merchandise, (2) Kawasaki used his protected work without authorization by including the photographs in its press kits that were distributed to the media, and (3) Hachette used his protected work without authorization by publishing the photographs in the June 2006 issue of *Cycle World* magazine. Latimer seeks a permanent injunction preventing defendants from infringing his copyright, an order directing defendants to tender all infringing

11

copies of his protected work or destroy the protected work under a writ of destruction pursuant to 17 U.S.C. § 503, and actual damages suffered as a result of the infringement and/or disgorgement of defendants' profits not taken into account in computing actual damages.

In December 2007, defendants moved for summary judgment arguing that Latimer's photographs are "unauthorized derivative works based upon protectable preexisting works created and owned by Ryan Hathaway," and as such do not qualify for copyright protection. The district court granted summary judgment to all defendants on Latimer's unfair competition claim holding that it is preempted by the Copyright Act. The district court also granted summary judgment to Kawasaki and Hachette on Latimer's copyright infringement claims holding that the photographs are not derivative works but that Latimer granted Kawasaki an implied license to use the photographs in its press release materials, and Hachette's subsequent publication of the photographs was fair use.

Latimer moved for reconsideration arguing that he had no notice the issues of implied license or fair use were to be considered on summary judgment. Latimer stated that the court's order "goes beyond the matters briefed by the parties and *sua sponte* grants Kawasaki summary judgment on the theory of implied license and Hachette summary judgment based upon fair use." Latimer

12

argued that the district court's power to grant summary judgment *sua sponte* is tempered by Rule 56's requirement that the nonmoving party be given an opportunity to oppose the motion. The district court disagreed with Latimer's assertion that he did not have sufficient notice of the issues but nevertheless granted his motion for reconsideration giving him the opportunity to brief the issues. On reconsideration, the district court again granted summary judgment to Kawasaki and Hachette repeating its prior holdings. The district court certified the case for immediate appeal under Rule 54(b)[6] and this appeal followed.

The district court also held that there are genuine issues of material fact, which preclude granting summary judgment to Roaring Toyz and Robert Fisher on Latimer's copyright infringement claim. That ruling is not before us.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, considering all the evidence and factual inferences in the light most favorable to the non-moving party. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009). Under Fed. R. Civ. P. 56(c), a motion for summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and

---

[6]"When an action presents more than one claim for relief — whether as a claim, counterclaim, crossclaim, or third-party claim — or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

Courts have historically viewed summary judgment as inappropriate in the copyright infringement context because of the inherently subjective nature of the inquiry. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008). Wrongful appropriation is typically shown by proving a "substantial similarity" of copyrightable expression. *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S. Ct. 216 (1931). Because substantial similarity is an extremely close question of fact, *see Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946), summary judgment has traditionally been frowned upon in copyright litigation, *see id.* at 474. However, in cases such as this, where substantial similarity is undisputed by the parties, non-infringement may be determined as a matter of law on a motion for summary judgment. *Cf. Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (recognizing that summary judgment is appropriate where "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that

14

the two works are substantially similar").

## III. DISCUSSION

*A. Copyright Infringement*

To establish a prima facie case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991). "To 'satisfy *Feist* 's first prong, a plaintiff must prove that the work . . . is original and that the plaintiff complied with applicable statutory formalities.'" *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995), *aff'd by*, 516 U.S. 233, 116 S. Ct. 804 (1996)). In a judicial proceeding, "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Once the plaintiff produces a certificate of registration, the burden shifts to the defendant to establish that "the work in which copyright is claimed is unprotectable (for lack of originality)." *Bateman*, 79 F.3d at 1541.

In the instant case, Latimer brought claims against defendant-appellees, Kawasaki and Hachette, pursuant to 17 U.S.C. § 501, alleging that they infringed

15

his copyright in the ZX-14 photographs. Latimer produced a certificate of copyright registration granted June 2006, less than four months after the photographs were initially published. Thus, Latimer benefits from a rebuttable presumption that his copyright is valid.

To satisfy Feist's second prong, a plaintiff must establish, as a factual matter, that the alleged infringer actually copied plaintiff's copyrighted material. *See id.* "Factual proof of copying, however, is only an element in satisfying the second prong of *Feist*." *Id.* "[T]he plaintiff must also respond to any proof advanced by the defendant that the portion of the work actually taken does not satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl. 8." *Id.* at 1542; *see also Feist*, 499 U.S. at 345-46, 111 S. Ct. at 1287-88 (noting that "[t]he *sine qua non* of copyright is originality," as well as emphasizing that it is a "constitutional requirement"). If a plaintiff survives a challenge to the originality requirement, they must also prove that "the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." *Lotus*, 49 F.3d at 813.

In the instant case, actual copying of Latimer's photographs is undisputed. Defendant-appellees distributed and published digital copies, which were indistinguishable from Latimer's original photographs. As such, substantial

16

similarity is not at issue. Defendant-appellees do not repeat their previous claims that Latimer's work "lacks sufficient originality, and is incapable of constituting copyrightable subject matter." Instead, on this appeal, defendant-appellees challenge Latimer's copyright by arguing that the photographs are "unauthorized derivative works based upon protectable preexisting works created and owned by Ryan Hathaway, and for which uses Latimer has not requested nor received a license."

*B. Derivative Works*

The subject matter of federal copyright includes derivative works, but the copyright in such works "extends only to the material contributed by the author," and does not affect any copyright protection in the preexisting material. 17 U.S.C. § 103(b). Under 17 U.S.C. § 101, "a derivative work must incorporate a substantial element of a preexisting work of authorship and recast, transform, or adapt those elements." *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 305 (S.D.N.Y., 2000). Furthermore, "protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully." 17 U.S.C. § 103(a). It is undisputed that the artwork on the customized ZX-14 motorcycles is the original, creative expression of Ryan Hathaway, and as such entitled to copyright

17

protection. The fact that Hathaway's artwork appears on useful articles does not diminish his copyright protection. *See* 17 U.S.C. § 113(a). Thus, Latimer's photographs do not qualify for copyright protection if they are derivative works made without Ryan Hathaway's authorization.

"Federal courts have historically applied a generous standard of originality in evaluating photographic works for copyright protection." *Schrock v. Learning Curve Int'l,* Inc., 586 F.3d 513, 519 (7th Cir. 2009). Except for a limited class of photographs that can be characterized as "slavish copies," courts have recognized that most photographs contain at least some originality in their rendition of the subject-matter. *Id.; see also Rogers v. Koons*, 960 F.2d 301, 307 (2nd Cir. 1992) ("Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."). Yet, courts have been reluctant to find that photographs of a preexisting work are derivative works. *Cf. Schrock*, 586 F.3d at 518 ("we will assume without deciding that each of Schrock's photos qualifies as a derivative work within the meaning of the Copyright Act"); *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002) (stating that "photographs of Beanie Babies are derivative works from the copyrighted Beanie Babies themselves" but basing that statement entirely on the parties' concession that the photographs were

18

derivative works); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068 (9th Cir. 2000) (sidestepping the derivative works question by holding that a vodka bottle, a useful article not subject to copyright protection, does not qualify as a preexisting work within the meaning of the Copyright Act). At least one influential district court[7] has held that photographs of preexisting works are not always derivative works. *See SHL Imaging*, 117 F. Supp. 2d at 305 (a photograph of a sculpture "merely depicts that sculpture; it does not recast, transform, or adapt" the authorship found in the preexisting work).

Relying exclusively on *SHL Imaging*, the district court concluded that "Latimer has not 'recast, transform[ed], or adopt[ed]' [sic] Hathaway's artwork," thus the photographs were not derivative works. We tend to agree with defendant-appellees that this apparent incongruity "tears a gaping hole in copyright protection that runs counter to every other section of the Copyright Act's clear intent to protect original works of authorship against misappropriation." If a photograph, which satisfies the originality requirement for copyright protection, does not recast, transform, or adapt an underlying work, then all original works are vulnerable to misappropriation by the photographer's lens. However, defendant-appellees offer

---

[7]The United States District Court for the Southern District of New York has developed substantial expertise in copyright law as a result of the large number of copyright cases litigated in that district each year.

no precedential support for their assertion that photographs of preexisting works are derivative works.

Further weakening defendant-appellees argument is the fact that the ZX-14 motorcycles were the subject matter and primary focus of Latimer's photographs. Latimer's photographs can best be described as being "based upon" the ZX-14 motorcycles, useful articles not subject to copyright protection. The fact that Hathaway's artwork appears in the photographs is merely incidental. However, we need not resolve the derivative work question if the photographs were made with Hathaway's authorization.

Even if the photographs are derivative works, they must also be unauthorized for defendant-appellee's argument to succeed. As noted previously, the copyright in a derivative work is defeated only when the underlying work has been misappropriated. Whether the copyright owner of an original work of authorship has granted a license to create a derivative work is a threshold question that must be answered before turning to the more difficult question of whether the derivative work qualifies as such. Thus, we need not resolve the derivative works question if the photographs were made with Hathaway's authorization.

*C. Implied License*

The Copyright Act requires a writing for all exclusive transfers of copyright.

20

*See* 17 U.S.C. § 204(a). However, non-exclusive licenses are exempt from this writing requirement, *see* 17 U.S.C. § 101, and "may be granted orally, or may even be implied from conduct," *Jarrod Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997). An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work. *See id.* Because an implied license is an affirmative defense to a claim of copyright infringement, "the alleged infringers have the burden of establishing an implied license." *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003).

Implied licenses may be limited and a defendant who exceeds the scope of an implied license commits copyright infringement. *See id.* Courts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license. *See Wilchombe v. Teevee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009); *Gracen v. Bradford Exchange*, 698 F.2d 300, 303 (7th Cir. 1983) (the scope of an implied license may be proven through parol evidence). In *Asset Marketing Systems, Inc. v. Ganon*, the Ninth Circuit held that a copyright owner must express the intent to restrict the scope of a license when they deliver the copyright work. 542 F.3d 748, 756 (9th Cir. 2008). Thus, an implied license will be limited to a specific use only

if that limitation is expressly conveyed when the work is delivered.

### 1. Did Hathaway Grant an Implied License?

Hathaway never executed a document granting an exclusive license in his original artwork. Thus, the photographs are unauthorized unless Hathaway granted a non-exclusive license, either orally or through conduct. Because defendant-appellees allege that Latimer's photographs infringe on Hathaway's original work, Latimer has the burden of establishing an implied license.

Hathaway's conduct satisfies all three prongs of the implied license test. Kawasaki requested that Roaring Toyz customize the ZX-14 motorcycles, and Roaring Toyz in turn asked Hathaway to apply custom paint and graphics to the motorcycles. Hathaway thus created the original artwork at Kawasaki's request. Hathaway knew the customized motorcycles, which sported his custom paint work, were to be used by Kawasaki to promote their new ZX-14 motorcycle. Thus, when Hathaway delivered the painted bodywork to Roaring Toyz, he constructively delivered the artwork to Kawasaki. Hathaway knew the customized motorcycles would be publicly displayed at Daytona Bike Week and photographed by the media. Hathaway also knew that both Kawasaki and Roaring Toyz sought as much media exposure as possible for the ZX-14 customization project. Thus, it is reasonable to infer that Hathaway intended that his artwork be photographed and

distributed by Kawasaki, Roaring Toyz, and the media. At a minimum, Hathaway granted Kawasaki and Roaring Toyz an implied license to copy and distribute his original work.

*2. Did Latimer Exceed the Scope of the License*?

While it is clear that Hathaway granted Kawasaki and Roaring Toyz an implied license, the question remains whether this implied license extends to Latimer's use of Hathaway's artwork. Latimer argues that his use of Hathaway's work was merely incidental but nevertheless fell within the scope of Hathaway's implied license. Hathaway knew that Kawasaki and Roaring Toyz intended to promote the customized motorcycles as widely as possible and did not expressly restrict the scope of the license when he delivered the work. Thus, Hathaway's implied license at least encompassed uses that promoted the ZX-14 motorcycle. Latimer's photographs were such a use. Roaring Toyz asked Latimer to photograph the ZX-14 motorcycles, which sported Hathaway's artwork, in response to Kawasaki's request for high quality promotional images. Roaring Toyz provided Latimer with access to the motorcycles and assisted his efforts in producing the images. As such, Latimer's use of Hathaway's artwork fell within the scope of what Hathaway intended when he granted the implied license. Thus, Latimer's photographs are not infringing works and qualify for copyright

protection.

### 3. Did Latimer Grant Kawasaki an Implied License?

Defendant-appellees claim that, even if Latimer's photographs enjoy copyright protection, they did not commit copyright infringement because Latimer granted them a non-exclusive implied license to use his work. The district court agreed and granted summary judgment to Kawasaki on this issue. We also agree that Latimer granted Kawasaki an implied license to use his photographs but find that Kawasaki's use might have exceeded the scope of that license.

Like Hathaway, Latimer never executed a document granting an exclusive license in his work and Latimer's oral representations regarding the use of his photographs are disputed by the parties. However, Latimer's conduct satisfies all three prongs of the implied license test. Kawasaki requested that Roaring Toyz provide it with photographs of the customized ZX-14s, and Roaring Toyz in turn asked Latimer to create those photographs. Latimer thus created the photos at Kawasaki's request. Latimer's deposition testimony indicates that he knew Roaring Toyz would send the photographs to Kawasaki to create the placard. Thus, when Latimer delivered the photographs to Del Cioppo, he constructively delivered them to Kawasaki. In addition, Latimer also testified that he consented to Kawasaki's request to use the photographs in a "slide show or PowerPoint

24

presentation or whatever is flashed up on a screen." Thus, Latimer granted Kawasaki an implied license to use his photographs. Latimer created the photographs at Kawasaki's request, delivered the photographs to Kawasaki, and intended that Kawasaki use the photographs on a placard and in a screen presentation.

Latimer contradicts some of his deposition testimony described above in an affidavit submitted after the district court vacated its first summary judgment order. Defendant-appellees argue that this affidavit should be dismissed as a sham because it contradicts prior sworn testimony.

A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984). However, "[t]his rule is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007). As such, courts must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.*

In his affidavit, Latimer states: "I did not know that Del Cioppo or Fisher forwarded the photographs to Kawasaki until Fisher or Del Cioppo told me that

Kawasaki was impressed with my photographs and wanted to use them in some type of slide show or PowerPoint presentation where the photographs would be flashed upon a screen." The affidavit contradicts both Latimer's April 4 deposition testimony that he knew and intended that Roaring Toyz would forward his photographs to Kawasaki, and his September 27 deposition testimony that he knew when he sent the photos that Kawasaki "might" use them. Given that there is an inherent inconsistency between the affidavit and the two previous depositions, and Latimer has failed to provide an explanation for the contradiction, the affidavit may be dismissed as a sham.

*4. Did Kawasaki Exceed the Scope of its License?*

It is clear from the record that Latimer gave Kawasaki an implied license to use his photographs. The question remaining is whether Kawasaki exceeded the scope of that license by including Latimer's photographs in its press kit. In reaching the conclusion that Kawasaki has not exceeded the scope of the implied license, the district court relied on an email sent by Latimer to Roaring Toyz. In the email, Latimer stated: "I know that Kawasaki will list you guys on the flyer for sure. Please forward my credit info to them so that they might attach it to the back of the flyer, that would be cool." The district court asserts, without explanation, that this email "confirms that [Latimer] did not limit Kawasaki's use to 'placards'

26

or a computer generated presentation flashed on the screen." The district court obviously understood the term "flyer" to mean "a handbill or circular for mass distribution." *Webster's Third New International Dictionary* 870 (3d ed. 1966). However, Latimer claims that he used the term "flyer" to refer to the placard to be displayed at Bike Week, and not to Kawasaki's press kit. When asked about the use of the word "flyer," Latimer testified that it was "[j]ust a poor choice of words . . . because it was a display, flyer, poster, placard. I think they all run [sic] about the same thing."

On summary judgment, Latimer's evidence must be taken at face value, and all justifiable inferences are to be drawn in his favor. Neither we nor the district court are to undertake credibility determinations or weigh the evidence. Although it may be a stretch, a reasonable person could believe that Latimer meant "placard" when he typed "flyer." Consequently, the district court's reasoning in this regard is insufficient to sustain summary judgment on this issue. We may, nevertheless, affirm the district court's judgment if alternative grounds exist for finding that Kawasaki did not exceed the scope of the implied license.

Kawasaki asserts that Latimer did not expressly communicate to Kawasaki any restrictions on the use of the photographs. However, Latimer contends that all of his communications with Kawasaki went through Roaring Toyz and that he

27

granted Kawasaki permission to use the photographs for a specific purpose-a media display at Bike Week. Thus, the question here is whether Latimer delivered a warning adequate to put Kawasaki on notice that certain uses of Latimer's photos would constitute copyright infringement.

Kawasaki relies on *Asset Marketing Systems*, as support for its argument that Latimer was required to expressly communicate the restriction directly to Kawasaki. 542 F.3d at 748. However, in *Asset Marketing Systems*, the parties were in direct communication with one another and the copyright holder did not attempt to limit the scope until after he had delivered the copyrighted work to the defendant. *Id.* at 757.

Latimer insists that he limited the scope of the license before delivering the photographs to Kawasaki. Latimer testified that he did so by expressing the limitations to Roaring Toyz, who acted as an intermediary between Latimer and Kawasaki. Latimer stated in his April 4 deposition that he made it clear to Roaring Toyz that the photos were not to be "leaked," i.e. published or distributed in any way other than on a placard. In his September 25 deposition, Latimer reiterated this point, claiming that he told Fisher and Del Cioppo, "These can never be in print." In addition, Latimer testified that he marked the photographs with metadata containing his contact information and "all rights reserved." Based on his

28

communications with Roaring Toyz and the copyright notice contained in the photograph's metadata, Latimer claims that he believed it was unnecessary to reiterate the limitations on the license when he emailed the photographs.

Latimer's deposition testimony raises genuine issues of material fact regarding the scope of Kawasaki's license. Even if Latimer agreed that Kawasaki could distribute his photographs to the media in a printed flyer, the distribution of the photographs in digital format on compact disks could be found to have exceeded the scope of the license. Furthermore, Kawasaki's distribution of Latimer's photographs in digital format may have enabled Hachette and others to infringe Latimer's copyright. Finding these genuine issues of material facts, that must be resolved by a jury, we reverse the district court's grant of summary judgment to Kawasaki.

D. *Fair Use*

"[W]hile there may be evidence of copying, not all copying is legally actionable." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 (11th Cir. 1996). The fair use doctrine is a statutory exception to copyright infringement, which seeks to balance First Amendment concerns with the protections otherwise afforded authors by the Copyright Act. The Supreme Court has described fair use as "a privilege in others than the owner of the copyright to use the copyrighted

29

material in a reasonable manner without his consent." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S. Ct. 2218, 2224-25 (1985). Section 107 of the Copyright Act specifically permits the unauthorized use of copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. Thus, defendant-appellees have not infringed Latimer's copyright if the use made of the photographs is a fair use under 17 U.S.C. § 107.

However, defendant-appellees did not assert a fair use defense in their answer to Latimer's complaint. They also never raised the issue of fair use in their motion for summary judgment. In fact, fair use was first raised by the district court *sua sponte* in its first order for summary judgment. Even after the district court vacated that order to allow the parties to brief, *inter alia*, the fair use issue, defendant-appellees only reference to fair use stated: "Defendants respectfully suggest that this Court need not go as far as fair use analysis in order to determine, as a matter of law, that Hachette's use of the photographs was lawful." On reconsideration the district court entered summary judgment in favor of Hachette, again holding that its publication of Latimer's photographs was fair use. On appeal, Latimer argues that Hachette waived the affirmative defense of fair use by failing to raise it in its answer. Defendant-appellees claim that fair use need not be

raised as an affirmative defense to copyright infringement because fair use is not an infringement at all.

*1. Is Fair Use an Affirmative Defense?*

Defendant-appellees assert that fair use is merely a denial of copyright infringement rather than an affirmative defense that admits the allegations of the complaint but provides another reason why the plaintiff may not recover. Defendant-appellees rely on the language of the statute itself for the proposition that the fair use of a copyrighted work "is not an infringement of copyright." 17 U.S.C. § 107. To further support their argument, defendant-appellees claim that "Judge Birch of this Court has repeatedly expressed this Court's view that 'fair use' is better viewed as an affirmative *right* rather than as a defense." However, defendant-appellees misrepresent Judge Birch's comments. In *Bateman v. Mnemonics, Inc.*, Judge Birch commented that "[a]lthough the traditional approach is to view 'fair use' as an affirmative defense, this writer, speaking only for himself, is of the opinion that it is better viewed as a right granted by the Copyright Act of 1976." 79 F.3d 1532, 1542 n.22 (11th Cir. 1996). Several years later in *Suntrust Bank v. Houghton Mifflin Co.*, Judge Birch commented that "fair use is commonly referred to as an affirmative defense, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590, 114 S. Ct. 1164, 1177 (1994), and, as we are bound by

Supreme Court precedent, we will apply it as such." 268 F.3d 1257, 1260 n.3 (11th Cir. 2001). Thus, a close reading of Judge Birch's comments reveal that he was expressing his personal views, not the views of this Court, but nevertheless recognized that binding Supreme Court authority requires us to treat fair use as an affirmative defense. Moreover, the Supreme Court explained in *Harper & Row*, that "[t]he drafters resisted pressures from special interest groups to create presumptive categories of fair use, but structured the provision as an affirmative defense requiring a case-by-case analysis." 471 U.S. at 561, 105 S. Ct. at 2231; *see also* H.R. Rep. No. 90-83, at 37 (1967). Thus, the fair use of copyrighted work is an affirmative defense and should be pleaded as such.

*2. Did the District Court Err by Raising Fair Use Sua Sponte?*

Failure to plead an affirmative defense generally results in a waiver of that defense. *See Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1012 (11th Cir. 1982); Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense"). Furthermore, "[c]ourts generally lack the ability to raise an affirmative defense *sua sponte*." *Hutcherson v. Lauderdale County, Tenn.*, 326 F.3d 747, 757 (6th Cir. 2003). Exceptions to this rule include timeliness objections to habeas petitions, even where the government has failed to plead timeliness as an affirmative defense. *See, e.g., Jackson v. Sec'y*

*for Dept. of Corrs.*, 292 F. 3d 1347, 1349 (11th Cir. 2002) (holding that "the district court possessed the discretion to raise *sua sponte* the timeliness issue"); *Hill v. Braxton*, 277 F.3d 701, 706 (4th Cir. 2002) (holding that a district court has the power to raise the limitations defense *sua sponte* because "[t]he one-year limitations period implicates values beyond the interests of the parties").

Defendant-appellees cite *Yellen v. Cooper* as an example of courts considering affirmative defenses *sua sponte*. 828 F.2d 1471 (10th Cir. 1987). In *Yellen*, the Tenth Circuit affirmed the district court's *sua sponte* grant of summary judgment based on an unpleaded affirmative defense, where the defense was obvious from the face of the complaint. *Id.* at 1474-75. The court reasoned that the policy underlying Rule 8(c) was to afford the plaintiff adequate notice of unanticipated defenses and, because the affirmative defense was obvious from the face of the complaint, the defense was not unanticipated in that case. *Id.* at 1476.

Relying primarily on *Yellen*, defendant-appellees argue that courts have discretion to consider certain defenses *sua sponte* where the applicable law reflects competing policy decisions. However, neither *Yellen* nor the *Jackson* line of cases provide justification for allowing courts to raise *sua sponte* every issue that implicates competing policy concerns. Rather, those cases give courts leeway to dismiss claims based on affirmative defenses that promote judicial efficiency, even

where the defendants fail to raise those claims themselves. The rationale underlying the *Jackson* line of cases is that habeas petitions, in particular, raise issues of federalism and judicial efficiency-interests that "eclipse the immediate concerns of the parties." *Hill*, 277 F.3d at 705. Similarly, *Yellen* promotes judicial efficiency by permitting summary dismissal before service on the defendant where it is clear from the face of the complaint that waiting for the answer will be superfluous. 828 F.2d at 1476.

In contrast, the goal of the fair use defense is to "strike a balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." *Harper & Row*, 471 U.S. at 556, 105 S. Ct. at 2228; *see also Suntrust Bank*, 268 F.3d at 1260, n.3 (fair use has "constitutional significance as a guarantor to access and use for First Amendment purposes"). That a constitutional right is involved does not mitigate a defendant's burden of pleading its own affirmative defenses. Here, Hachette has not offered any justification for its failure to plead fair use. Unlike the cases considered above, courts considering the fair use defense have no interest that eclipses the party's own interest in protecting its First Amendment right to fair use of copyrighted material. Thus, the district court erred in raising the fair use defense *sua sponte*. As such, we reverse the district court's grant of summary judgment to Hachette,

34

deferring the question of whether Hachette has waived the fair use defense. We are not ruling as a matter of law that Hachette has waived the fair use defense because this issue has not been properly presented in the district court. As previously noted, failure to plead an affirmative defense generally results in a waiver of that defense. *See Jackson*, 678 F.2d at 1012; Fed. R. Civ. P. 8(c). However, there are exceptions to this rule and the district court is free on remand to entertain a motion to amend by Hachette to assert the affirmative defense of fair use.[8]

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of summary judgment to Kawasaki and Hachette on their unauthorized derivative works argument, reverse the district court's grant of summary judgment to Kawasaki based on implied license, reverse the district court's grant of summary judgment to Hachette based on fair use, and remand for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[8]Should the district court ultimately rule that Hachette has not waived the defense of fair use, it must consider the four factors of § 107 in determining whether Hachette's publication of the photographs was fair use. *See* 17 U.S.C. § 107; *Harper & Row*, 471 U.S. at 560, 105 S. Ct. at 2230; *Pacific and Southern Co., Inc. v. Duncan*, 744 F.2d 1490, 1494 (11th Cir. 1984). If fact questions are in dispute, these must be resolved by the jury.