[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12371
_____

D.C. Docket No. 5:11-cv-01511-IPJ

KEITH KARLSON,

Plaintiff - Counter Defendant -Appellant,

versus

RED DOOR HOMES, LLC,
SMA OPERATIONS MANAGEMENT, LLC,
RDH ADVISING, LLC,

Defendants - Counter Claimants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(May 7, 2015)

Before MARCUS, ROSENBAUM, and GINSBURG,[*] Circuit Judges.

PER CURIAM:

Keith Karlson appeals from the district court's order granting summary judgment to Red Door Homes, LLC, SMA Operations Management, LLC, and RDH Advising, LLC (collectively, "Red Door"), in his action for copyright infringement, breach of contract, and conversion. Karlson claims that Red Door unlawfully sold and relicensed his computer-generated illustrations of architectural plans, or renderings, to third parties. The district court found that Karlson impliedly granted to Red Door a nonexclusive license to use and distribute the renderings, a finding that it determined disposed of all of Karlson's claims. For the reasons that follow, we affirm.

## I.

Karlson is a self-employed artist who makes renderings of homes—colored illustrations of what homes will look like when built—from architectural plans. In the normal course of Karlson's business dealings, a customer sends Karlson an email with attachments containing certain architectural plans. Karlson uses a computer, a camera, and Photoshop software to create a rendering, and then emails the customer back, sending the rendering to the customer as an email attachment.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia, sitting by designation.

2

He later emails the customer an invoice for the work, and he is paid one fee per rendering.

Karlson met Patrick Miller, an architectural home plan designer, in 1998. Miller would frequently ask Karlson to create renderings of Miller's home designs and plans if one of Miller's homebuilder clients requested such renderings. In or around 2005, Karlson and Miller formed a business together for the purpose of licensing their existing stock of previously created designs and renderings. Miller would sell drafting and design consultation to homebuilders, and he would refer the homebuilders to Karlson to obtain renderings.

In 2008, Miller became a minority shareholder of Red Door Homes, LLC, and he is currently the Director of Product Development there. That entity provides support to developers and homebuilders, such as marketing, purchasing, estimating, drafting, designing, and accounting. It aims mainly to provide software estimates and building packages to developers and homebuilders through license agreements. The licensees receive proprietary planning and ordering software and the ability to access rendered home plans and designs.

In April 2008, Miller began ordering renderings from Karlson on behalf of Red Door. Karlson testified that when he created a rendering for Red Door, he understood that Red Door was going to use his rendering in a product line it was selling to homebuilders—in other words, that his rendering would be presented to

3

potential homebuilder clients and offered as part of the assets and services that Red Door was advertising to those clients.  Karlson further conceded that, before he sent any renderings to Miller, he understood that Red Door intended to take his renderings and sell them to clients, or that Red Door would provide the renderings to others.  And, Karlson acknowledged that he understood that if Red Door found a willing client, his renderings would be sold to the client.  In addition, Karlson explained that he understood that Red Door would not be building homes; instead, the clients to whom the renderings were provided were going to build homes.  Significantly, Karlson testified that he gave Red Door "clear permission" to sell clients his renderings along with Red Door's plans and services.  But, Karlson contends, he believed he would get paid each time Red Door did.

From April 2008 through November 2009, Red Door placed twenty-three separate orders from Karlson, and Karlson created approximately 130 renderings for Red Door.  Karlson emailed twenty-three separate invoices to Miller for the renderings, sending each invoice sometime after he created and delivered to Miller the relevant renderings.  Red Door paid each and every one of these invoices.

The bottom of each email invoice contained a "Copyrights Declaration," drafted by Karlson, which Karlson never discussed with Miller.  The declaration provided that, with the delivery of the renderings in the invoice, Karlson transferred to Red Door "a limited copyright to reproduce the artwork . . . in

4

unlimited quantities on any media . . . , royalty-free, but only for use directly by [Red Door] . . . ." It provided that the "copyright may not be transferred to, or utilized for the benefit of, another business entity without [Karlson's] expressed permission." It further provided, "By using the artwork in any way, [Red Door] hereby agree[s] to these terms and limitations to the copyrights transferred to [Red Door] with delivery of [Red Door's] artwork." Notably, Karlson had never before placed a copyright declaration on any invoice that he had emailed to Miller; but, for the first time in all of his dealings with Miller, he included the copyright declaration in the invoice emails for the work he did on behalf of Red Door. Nor had Karlson ever before received any royalty payments from Miller or Miller's employers for renderings.

Around October or November 2009, Karlson discovered that Red Door had made what he believes were impermissible, undisclosed distributions of his renderings. He wrote an email to Miller in which he explained that he thought he would be getting paid each time Red Door transferred a rendering to a client. He also asked Red Door to pay him royalty fees based upon the number of builders the artwork benefitted and the number of renderings those builders used.

Miller responded that Red Door could not agree to Karlson's terms, as it would not be a wise business model for Red Door. In response, Karlson demanded that Red Door inform third parties using his artwork to immediately cease and

5

desist.  Miller replied that Red Door would respond in a timely and professional manner, most likely by removing the renderings from its website and brochures and replacing them with a new set of renderings.

Karlson applied for copyright protection for the renderings and was issued a Certificate of Copyright Registration effective December 18, 2009.  On January 26, 2010, Red Door internally informed personnel, via email, that Karlson's renderings would be removed from the website and replaced as soon as possible. The email explained that Red Door had found another source of renderings from which it clearly obtained the unlimited rights to use the artwork, and it expected to have the new renderings within two weeks.  Red Door asserts that it informed its licensees by telephone calls in early 2010 to no longer use Karlson's renderings. Though Karlson asserts that Red Door continues to use his renderings, whether this is correct is unclear from the record.

## II.

We review a district court's grant of summary judgment *de novo*, viewing all evidence and drawing all inferences in favor of the nonmoving party.  *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

III.

The Copyright Act provides a copyright owner with the exclusive right to copy, distribute, or display his work. *See* 17 U.S.C. § 106; *MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir. 1991). A copyright owner can transfer copyright ownership through the grant of an exclusive license, but the grant must be in writing. *See* 17 U.S.C. §§ 101, 204(a); *MacLean Assocs.*, 952 F.2d at 778. Alternatively, a copyright owner may allow another to use the copyrighted material without transferring ownership in the material through the grant of a nonexclusive license. *See Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999). With an implied nonexclusive license, "the copyright owner . . . permits the use of a copyrighted work in a particular manner." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). The grant of a nonexclusive license does not require a writing under the Copyright Act, and it may occur orally or may be implied from the copyright owner's conduct. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010); *see* 17 U.S.C. §§ 101, 204(a).

Because an implied nonexclusive license can provide an affirmative defense to a claim of copyright infringement, the alleged infringer bears the burden to show that such an implied nonexclusive license exists. *Latimer*, 601 F.3d at 1235. "An implied license is created when one party (1) creates a work at another's request;

7

(2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Id.*  Courts examine the totality of the parties' conduct to evaluate intent. *See Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010).

We have instructed, "In determining whether an implied license exists, a court should look at objective factors evincing the party's intent, including deposition testimony and whether the copyrighted material was delivered without warning that its further use would constitute copyright infringement." *Wilchombe*, 555 F.3d at 956 (internal quotation marks and citation omitted).  An implied nonexclusive license may be limited in scope, and a defendant commits copyright infringement if he exceeds the scope of the license. *Latimer*, 601 F.3d at 1235. So, courts must focus on objective evidence revealing the intent of the parties both to determine whether an implied license exists and, if so, to determine the scope of the license. *Id*. "[A]n implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Id.*

Here, we agree with the district court that Karlson impliedly granted Red Door a nonexclusive license to use and distribute his renderings.[1]  It is undisputed that Karlson created the renderings at Red Door's request and delivered them to

---

[1]  For the purposes of this discussion, we assume without deciding, as the district court did, that Karlson holds valid copyrights in his renderings.

Red Door. With respect to Karlson's intent, the record shows that Karlson knew that Red Door would be using and distributing his work to clients. He testified that when he created renderings for Red Door, he understood that Red Door was going to use the renderings in the product line it was selling to homebuilders and that his renderings would be presented to potential clients and offered as a part of the assets and services Red Door advertised to those clients. He also stated that he knew that Red Door was going to "sell or provide" his renderings to clients along with Red Door's plans and services and that he gave Red Door "clear permission" to do so.[2]

Karlson argues that, though he may have granted a nonexclusive license to Red Door to use and distribute his renderings, he intended any such license to be limited in scope so that Red Door could not sell and relicense his renderings to clients. In support of this position, Karlson asserts the following: (1) he had never authorized any customer to license his renderings to third parties without additional compensation in the past; (2) he had an eight-year course of performance with

---

[2] In a prior appeal in this case, this Court stated in the factual background section of the opinion that Red Door "licensed Karlson's illustrations to third parties without Karlson's knowledge or permission." *Karlson v. Red Door Homes, LLC*, 553 F. App'x 875, 876 (11th Cir. 2014) (per curiam). We do not read this statement as a factual finding, as the Court in that decision did not address the facts or the merits of Karlson's claims. *See id.* at 876-78. Instead, the Court merely remanded the case to the district court because the parties had not had the opportunity to address the implied nonexclusive license issue below: the district court had decided Karlson's claims on that ground *sua sponte* without giving adequate notice to the parties. *Id.* at 876. Thus, the Court's statement was not meant to constitute a finding, but rather recited Karlson's allegations to give context to the Court's decision.

Miller whereby Miller's customers ordered renderings from Karlson, and each customer paid separately for the renderings; (3) he drafted and included a notice of limited copyright in each of the twenty-three separate invoices he emailed to Miller; and (4) he immediately applied for copyright protection and emailed Red Door upon discovering that it had been relicensing his renderings to clients for their own copying and distribution.

We find Karlson's arguments unavailing. First, though Karlson claims that he never authorized any customer to relicense his renderings to third parties without additional compensation, he provides no evidence of any circumstance in which he denied such authorization to a customer. Second, nor does Karlson present any evidence that in his prior dealings with Miller, he was ever paid more than once for a rendering. Karlson did not provide any evidence of any situation in which he received multiple payments for his renderings, and he testified that he never before received any royalty payments from Miller or Miller's employers for renderings he sold to them.

Third, though Karlson included a copyright declaration in his email invoices through which he purportedly intended to limit the scope of Red Door's use of his renderings, each and every invoice pertained to only renderings that Karlson had previously delivered to Red Door. But an implied license is "limited to a specific use only if that limitation is expressly conveyed *when the work is delivered*."

10

*Latimer*, 601 F.3d at 1235 (emphasis added); *see also Wilchombe*, 555 F.3d at 956 (explaining that the court looks at "objective factors evincing the party's intent, including . . . whether the copyrighted *material was delivered without warning* that its future use would constitute copyright infringement") (internal quotation marks and citation omitted) (emphasis added).  Because there is no evidence that Karlson intended to limit the scope of Red Door's use of his renderings at the time that he delivered the renderings, he could not have, as a matter of law, limited the scope of the nonexclusive license he granted.

Finally, the fact that Karlson emailed Red Door demanding additional payment and applied for copyright protection immediately upon discovering that Red Door had been relicensing his renderings to customers is, at best, weak, if any, evidence of Karlson's intent when he created and delivered the renderings.

For these reasons, we find that the scope of the nonexclusive license that Karlson impliedly granted to Red Door was not limited to the use and distribution of his renderings, but also included the right to sell and relicense the renderings to third-party clients.  We conclude that the district court properly granted summary judgment to Red Door on Karlson's copyright-infringement claim.

## IV.

The district court also properly granted summary judgment to Red Door on Karlson's breach-of-contract and conversion claims.

Karlson's breach-of-contract claim turns on whether his post-delivery copyright declaration is enforceable as part of the parties' agreement. It is not. Through the copyright declaration in each of the invoices, Karlson attempted to materially alter the terms of the parties' agreement regarding the scope of a nonexclusive license that he had already impliedly granted. But, as discussed previously, to limit the grant of a nonexclusive license to a specific use, a copyright owner must expressly convey the limitation when the work is delivered. *See Latimer*, 601 F.3d at 1235. Thus, each time Karlson emailed an invoice for renderings he had already delivered, it was too late for him to modify the parties' agreement with respect to the scope of the license for the previously delivered works. Because the copyright declaration could not have become part of the parties' agreement, Red Door could not have breached the terms in the copyright declaration.

Karlson's conversion claim similarly fails. Karlson argues that Red Door's selling and relicensing of his renderings constituted conversion because it was an illegal assumption of ownership. Under Alabama law,[3] a conversion is "a wrongful taking or a wrongful detention or interference, an illegal assumption of ownership, or an illegal use or misuse of another's property." *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 628 (Ala. 2010) (quotation marks and citation

---

[3] Karlson asserts the conversion claim under Alabama law.

12

omitted).  Here, because Karlson impliedly granted Red Door the right to sell and license his renderings, its selling and relicensing of his renderings was not wrongful or illegal.[4]

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Red Door on all of Karlson's claims.

**AFFIRMED**.

---

[4]  We note that Red Door argues that Karlson's conversion claim is preempted by the Copyright Act, which preempts certain state-law claims.  *See* 17 U.S.C. § 301(a); *Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1325 (11th Cir. 2010).  We do not opine on this issue because we find that Karlson's claim for conversion fails regardless of whether it may also be preempted.