[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 11, 2011
JOHN LEY
CLERK

_____

No. 09-15690

_____

D. C. Docket No. 08-00377-CV-ORL-22-GJK

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Plaintiff-
Counter-Defendant-
Appellee,

versus

ANNA N. DUCKWORTH,
Personal Representative of the
Estate of Aquila E. Duckworth,

Defendant-
Counter-Claimant-
Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 11, 2011)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal sits at the intersection of our summary judgment jurisprudence and Florida's choice of law rules. The defendant, Anna N. Duckworth ("Anna") and her husband, Aquila E. Duckworth ("Aquila"), purchased two automobile insurance policies and one motorcycle insurance policy from the plaintiff, State Farm Mutual Automobile Insurance Company ("State Farm"), while they were Maryland residents. All three insurance contracts contained "anti-stacking" provisions that precluded the Duckworths from recovering uninsured motorist benefits under any policy other than that covering the damaged vehicle. Maryland law explicitly permits the use of such anti-stacking provisions in insurance policies without the informed consent of an insured.

The Duckworths subsequently moved to Florida, where Aquila was struck and killed by an uninsured motorist while driving the motorcycle covered under the Maryland policy. State Farm immediately paid Anna, as representative of Aquila's estate, the uninsured motorist benefits called for by that policy, $100,000, but, citing the anti-stacking provisions, later denied Anna's claim for benefits under the two automobile policies. State Farm then brought this action in the district court, seeking a declaratory judgment that it had satisfied its contractual

2

obligations to Aquila's estate.[1]  Anna answered State Farm's complaint, asserted

affirmative defenses, and counterclaimed for breach of contract.[2]  She alleged that

the policies should be construed under Florida, and not Maryland, law.  Because

Florida law prohibits the use of anti-stacking provisions absent the insured's

informed consent, and because neither Anna nor Aquila had given their informed

consent, Anna argued that Aquila's estate should be entitled to recover uninsured

motorist damages on all three policies.

At issue before the district court was the applicability of the public policy

exception to Florida's choice of law rule in disputes over contract terms.  Since

Florida follows the rule of lex loci contractus—that is, Florida courts apply the law

of the jurisdiction in which the contract was entered into—the parties conceded

that, absent the exception, Maryland law would control and State Farm would be

entitled to declaratory relief.  See State Farm Mut. Auto. Ins. Co. v. Roach, 945 So.

2d 1160, 1163 (Fla. 2006) (explaining that an insurance contract is entered into in

the state in which the contract was issued and delivered).

The public policy exception demands that Florida law control whenever the

State has (1) a paramount public policy interest in the application of its own law

---

[1]  The district court had jurisdiction under 28 U.S.C. § 1332.

[2]  Anna asserted various other counterclaims not at issue here, including one for contract reformation and another for breach of fiduciary duty.

3

and (2) a citizen in need of protection.[3] Id. at 1164–65. Whenever an insurance contract is at issue, it is also necessary that the insured party seeking to benefit from the exception satisfy a third prong: the insured must provide the insurer with reasonable notice "of a permanent change of residence," id., such that the insurance risk would thereafter be "centered in Florida," Gillen v. United Servs. Auto. Assoc., 300 So. 2d 3, 7 (Fla. 1974). The third prong's reasonable notice requirement is meant to "inform[] the insurer of which state's law will govern the policy" and turns on the clarity with which an insured expressed his intent to make Florida his permanent home. Roach, 945 So. 2d at 1165. Because "the public policy exception is intended to be narrow," it displaces Florida's lex loci rule only when all three prongs of the exception, including the reasonable notice requirement, have been satisfied. Id. at 1167.

Following discovery, State Farm and Anna filed cross-motions for summary judgment on State Farm's request for declaratory relief under Federal Rule of Civil Procedure 56, and State Farm sought summary judgment on Anna's counterclaims. The district court granted summary judgment to State Farm on all claims. In

---

[3] In this opinion, we refer generally to the "public policy exception" or the "exception" as well as to the exception's individual prongs. The exception's third prong requires what we refer to as "reasonable notice," where "reasonable notice" is notice by the insured to the insurer that the insured is permanently residing in Florida and subject to the protection of Florida law. See State Farm Mut. Auto. Ins. Co. v. Roach, 945 So. 2d 1160, 1164–65 (Fla. 2006)

addressing State Farm's motion for declaratory relief, the court found for State Farm on each of the three prongs of the public policy exception, holding that (1) no paramount public policy required the application of Florida law, (2) the Duckworths had yet to establish themselves as Florida citizens, and (3) State Farm was not given reasonable notice that Florida law would govern the Duckworths' policies. The court then declared that State Farm had satisfied its contractual obligations to Aquila's estate and dismissed Anna's counterclaims.

Anna now appeals.[4] She claims that issues of material fact remain that preclude summary judgment on each of the exception's three prongs. Of particular importance to this appeal, Anna argues that it is disputed whether she informed a State Farm representative that her and Aquila's move to Florida was "permanent." She suggests this is a material question of fact that must be resolved before any judgment may issue.

We disagree and affirm. Taking into account all of the undisputed facts, and assuming that Anna informed a State Farm representative that the Duckworths' move would be "permanent," State Farm still did not receive reasonable notice sufficient to trigger the public policy exception. In fine, even if Anna informed the representative as alleged, her later actions overwhelmingly indicated to State Farm

---

[4] We have jurisdiction pursuant to 28 U.S.C. § 1291.

5

that the Duckworths' move to Florida was not necessarily permanent and that, consequently, Maryland law would continue to govern the Duckworths' policies. The issue of fact upon which her appeal rests is therefore immaterial and, as State Farm was deprived of reasonable notice, judgment as a matter of law was proper.

## I.

The undisputed record evidence establishes the following facts.[5] In 1989, Anna moved to Edgewater, Florida, with her mother, her two daughters, Nikki and Falon, and her youngest sister. There, in 1996, Anna met Aquila. They married in October 1998, while Aquila was in Navy training in Illinois. At that time, they both had Florida drivers' licenses and were registered to vote in Florida.

In December 1998, the Duckworths left Edgewater for San Diego, California, where Aquila was to be stationed. At that time, they owned one vehicle, Aquila's 1971 Cadillac Deville. Anna rented a San Diego apartment for her, Aquila, and her two daughters beginning in January 1999. By July of that year, they had insured the Cadillac with a local State Farm agent, Jack Dale, and added a second autmobile policy for a newly-purchased Ford Probe. As Anna understood them, these "full

---

[5] In reviewing a summary judgment, we consider the evidence in the light most favorable to the non-movant. Centurion Air Cargo, Inv. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). Thus, in stating the facts, we afford Anna, the non-movant, all credibility choices and the benefit of all reasonable inferences the facts yield. Latimer v. Roaring Toyz, 601 F.3d 1224, 1237 (11th Cir. 2010).

coverage" policies were consistent with the California insurance "requirements" Dale described to her. In 2001, after purchasing a Yamaha V-Star Classic motorcycle, the Duckworths purchased a third (motorcycle) policy as well as a renters' insurance policy from Dale's State Farm agency. All of the Duckworths' policies were paid by automatic draft from their joint checking account at the North Island Federal Credit Union in San Diego.

While in San Diego, Anna and Aquila received mail from the Florida Department of Highway Safety and Motor Vehicles notifying them that they needed to renew their Florida drivers' licenses. Anna completed the required forms over the Internet, and she and Aquila received their renewed licenses shortly thereafter. Though issued by the Florida agency, the renewed licenses listed the Duckworths' San Diego address as their place of residence. All three vehicles—the Cadillac, the Ford, and the Yamaha motorcycle—were registered in California and had California tags.

In 2003, Aquila requested a transfer from his post in California. He was thereafter assigned to the National Naval Medical Center in Bethesda, Maryland, as a military police officer. Before the Duckworths left for Maryland, Anna notified Dale of their impending move and cancelled their renters' insurance policy. At that time, Dale informed Anna that, once settled, she should get in touch with a State

Farm agent in Maryland, and he offered to find an agent for her if she needed one.

The Duckworths left San Diego in March 2003. They took with them the Probe and the motorcycle; the Cadillac was left behind and presumably sold. In April, Anna and Aquila moved into a Germantown, Maryland, apartment with Falon; Nikki, had moved from California to Florida. Anna got herself, Aquila, and Falon settled, but never asked Dale to find her a Maryland State Farm agent. Instead, within "a month or two," Anna found the phone number for the Connie Davis State Farm agency in a phone book advertisement and called to request a renters' insurance quote. While on the phone with a Davis agency representative, Anna also obtained an automobile and motorcycle insurance quote. She then went to the agency's office and applied for insurance on the Probe and the motorcycle. She did not purchase renters' insurance at that time. While at the agency office, Anna submitted her and Aquila's (Florida) drivers' licenses to be copied and also provided the agency representative with VINs for the Probe and the motorcycle. The Connie Davis agency issued policies for both vehicles that fully complied with Maryland insurance requirements.

The Duckworths paid the same amount for their Maryland policies as they had for their California policies, and they received approximately the same "full coverage" as in California. State Farm billed the Duckworths for their Maryland

8

policies on the 15th of every month. Once again, payment was automatically debited from Anna's and Aquila's joint checking account at the North Island Credit Union in California.

On January 6, 2004, State Farm sent notice to Aquila, the principal insured on all of the Duckworths' policies, that under Maryland law he—and any family member who might operate an insured vehicle—must immediately obtain a Maryland drivers' license and discard the Florida license then on file with State Farm. The notice gave Aquila sixty days to provide State Farm with a new drivers' license number demonstrating that he had complied with the notice. Aquila ignored the notice and did not share it with Anna. Consequently, neither obtained a Maryland license. Nor did they ever register to vote in Maryland.

Anna's principal contact at Connie Davis' State Farm agency was Francesca "Frankie" Whiting. As the Duckworths' State Farm agent, Whiting handled Anna's subsequent application for and the issuance of a renters' insurance policy with State Farm. She also assisted Anna when, in 2005, the Duckworths acquired a 1998 Chevrolet Cavalier and insured it with the Connie Davis agency. At Anna's request, Whiting even met with Falon when Falon purchased a vehicle and insured it, a Pontiac Trans Am, with State Farm.

9

In December 2004, Falon married and moved to Utah.[6] Anna told Falon to contact Whiting when she got to Utah to let State Farm know about her permanent change in residence. Falon and her husband eventually obtained Utah insurance through another carrier.

Aquila's Navy enlistment was set to expire in May 2006, and he and Anna decided that he would not reenlist. The Duckworths instead planned to move to Florida, where Nikki lived. Once in Florida, Aquila would apply for a job with the U.S. Marshals or the Fish and Wildlife Service while Anna found temporary employment. Once Aquila found a job, he and Anna would move again, this time to a place nearer his duty station, and Anna would then find permanent employment.

Aquila's enlistment expired on schedule in May. Anna then phoned the Connie Davis agency and informed Whiting that she and Aquila would be moving to Florida and would no longer need a Maryland renters' insurance policy. At that time, Anna gave Whiting Nikki's Florida address (125 West Loop, Oak Hill, FL 32759) and told Whiting that she and Aquila would be staying there only temporarily.[7] Whiting understood from her conversation with Anna that State Farm

---

[6] By this time, Falon had sold the Trans Am and purchased a Mercury Cougar. The Cougar was also insured by State Farm through the Connie Davis agency.

[7] It was during this conversation between Anna and Whiting that Anna allegedly stated that her move to Florida would be permanent. During Anna's deposition, counsel for State Farm

should, until further notice, send all future correspondence relating to the remaining automobile and motorcycle policies to that address. Anna later personally visited the agency office and drafted, on State Farm letterhead, a hand-written note canceling the Duckworths' Maryland renters' insurance policy.

The Duckworths moved in with Nikki, leaving the majority of their belongings at a storage facility near Nikki's home. In June 2006, Anna requested insurance quotes for the Probe, Cavalier, and motorcycle from her mother's insurance agent, Debbie Banks, at the Charlie Cobb State Farm agency in Edgewater. The quotes Banks provided were, according to Anna, "exorbitantly high," about $100 a month more than what the Duckworths had paid for their Maryland policies. Accordingly, though Banks informed Anna that the Duckworths should "find a[] [Florida] agent," Anna declined to purchase any Florida insurance

---

asked Anna how she had described her move to Florida. Anna responded that she had told Whiting that she and Aquila would be living "[t]emporarily with my daughter[, but p]ermanently in the State of Florida." Whiting later testified that she did not remember Anna making that statement, but that, if Anna had said something to that effect, it would have been her practice to instruct Anna to immediately obtain Florida coverage.

A disputed issue of fact will preclude summary judgment if it is material to a legal claim. A fact issue is material if it has the potential to alter the disposition of that claim. In this case, the disputed issue would be material if a fact-finder, having found that Anna did indicate that her and Aquila's move to Florida would be permanent, would be justified in deciding this case in favor of applying the public policy exception. If, however, we assume that Anna made the disputed statement and nevertheless conclude that State Farm still had valid reason to doubt that the Duckworths intended to permanently reside in Florida, the dispute is immaterial and judgment as a matter of law proper. As indicated supra and explained infra, we conclude that this latter scenario is the case. Consequently, it is unnecessary to decide this disputed issue of fact to resolve this appeal.

at that time. Anna explained that, had she intended to settle in Edgewater, she would have shopped around for more competitive rates.[8] But, as she was not certain where she and Aquila would ultimately live, Anna did not seek quotes from a State Farm competitor until December 2006, when, after reading a GEICO advertisement, she obtained an online quote from that company, but again decided against purchasing any Florida insurance because of its cost.

Instead, Anna maintained her existing Maryland policies, which were still being paid by an automatic debit from the Duckworths' California checking account. In July 2006, for instance, Anna called Whiting to inform her that the motorcycle's California registration had expired, that Aquila had registered the motorcycle in Florida, and that the motorcycle had a new Florida license plate. In response to Anna's call, Whiting sent Anna new proof-of-insurance cards that included the updated information.

In November 2006, Anna again called Whiting, this time to inform Whiting

---

[8] Anna's conversation with Banks gave rise to another disputed issue of fact. Anna claims that she informed Banks that she and Aquila would not know where in Florida they would permanently settle until Aquila found a permanent job and that Banks, in turn, advised her to wait before obtaining Florida insurance because auto insurance rates in Volusia County—home to Edgewater—were higher than in other Florida counties. Banks testified that she made no such statement and that, regardless, auto coverage in Volusia County was not more expensive than elsewhere in Florida. Again, because we must determine whether this dispute issue is material, we presume that Banks did tell Anna to wait before obtaining Florida insurance. And again, because we conclude that, regardless of what was said by Banks, Anna nonetheless failed to clearly express to State Farm that she and Aquila never would live outside of Florida, we find no disputed issue of material fact that would preclude summary judgment.

12

that the Probe was no longer being driven and to request that Whiting change the Probe's "status" from "full coverage" to "nondriving." Anna hoped the change in status would reduce the insurance premium she and Aquila owed on the car. Also, during that conversation, Whiting asked the status of Aquila's job search, and Anna told her that Aquila was "still putting in applications all over Florida." Then, on November 9, 2006, Anna faxed Whiting a typed confirmation of the request that listed Nikki's address as their place of residence.[9]

Also on November 9, Whiting updated the Duckworths' mailing address to show that they were temporarily staying at Nikki's house. Nikki's address thereafter appeared in the State Farm computer system as the Duckworths' mailing address, but not their permanent home address.

On December 15, 2006, after having processed the Duckworths' mailing address change, State Farm's "Move Center" sent Aquila a letter containing the address and phone number of a nearby State Farm agent in Edgewater, Buddy Davenport. The letter instructed Aquila to contact Davenport and provided him with a list of the Duckworths' existing insurance policies. The letter informed Aquila that he should let Davenport know "if there are any other policies that also

---

[9] Anna explained that Aquila had asked her to change the Probe's status, that she was not certain why Aquila requested that she do so, and that their financial situation at the time was "close," but not dire.

need to be transferred," and it reminded him that "[t]here may be some additional limitations on the availability of property and casualty insurance in your new location" that might "affect the transfer of your policies." The letter concluded with the following caveat: "If your new address is temporary or a change of your 'mailing address,' please contact [the Move Center] or your current agent. In these situations, your current agent may continue to serve your insurance needs." Aquila never responded to the letter, and Anna never saw it. Neither Aquila nor Anna contacted Davenport. The Duckworths instead renewed their Maryland policies with the Connie Davis State Farm agency.

Meanwhile, Aquila had applied with several potential employers, both inside and outside of Florida, but had requested that he only be considered for positions within Florida. Aquila, however, had received no offers.[10] To ensure an income while continuing his job search, Aquila joined the Navy Reserves.[11] Aquila also obtained part-time employment at G.I. Jeffs, an Army/Navy surplus store in Edgewater and volunteered regularly at the local American Legion post. Also,

---

[10] According to Anna, despite his difficulties in finding permanent employment, Aquila would have steadfastly refused to accept any employment opportunity outside Florida, even if that opportunity entailed working just over the Florida/Georgia border at the Kings Bay Naval Station (adjacent to St. Marys, Georgia). Neither Aquila nor Anna, however, communicated that fact to State Farm.

[11] Aquila joined the Navy Reserves in October 2006 and remained in the Reserves until his death. He took part in Reserve activity one weekend a month under a Reserve command in Orlando.

14

Aquila eventually acquired a handgun and obtained a Florida license to carry it, listing Nikki's address as his place of residence on his application for the license. Nevertheless, as Aquila saw his employment as temporary, he and Anna never decided where they were going to settle permanently, and they took no steps toward obtaining their own home.

On March 26, 2007, while riding his motorcycle, Aquila was in an accident with an uninsured motorist and died from his injuries. Anna called Whiting and notified her of the accident and Aquila's death. Whiting subsequently informed the State Farm claims department, which handled the matter from that point forward.

State Farm paid Anna the uninsured motorist benefits called for by the Maryland motorcycle policy, but denied payment on her claim under the two automobile policies. State Farm, however, failed to cancel the motorcycle policy. And because State Farm's records listed the policy as active, State Farm mistakenly sent Anna notice on May 18, 2007, that it intended to renew the motorcycle policy. The notice upset Anna, who called Whiting to cancel all of her existing policies with State Farm and later faxed Whiting a handwritten letter confirming her desire to cancel the motorcycle policy, effective March 27, 2007 (the day after Aquila was killed), and the Probe and Cavalier policies, effective May 18, 2007 (the day Anna received the renewal notice). After she canceled her State Farm coverage, Anna

15

immediately obtained Florida insurance policies for the Probe and Cavalier. She later filed this action on behalf of Aquila's estate in the district court.

## II.

In this case, since we are exercising our diversity jurisdiction, we look for a Supreme Court of Florida decision based on facts essentially indistinguishable from the facts at hand to inform our decision. CSX Transp., Inc. v. Trism Specialized Carriers, Inc., 182 F.3d 788, 790 (11th Cir. 1999). Where, as here, we find no Supreme Court decision directly on point, we must anticipate how the Supreme Court would decide this case. Id. In doing so, we consider, in addition to Supreme Court precedent, decisions of the State's intermediate appellate courts that appear to be on point, provided that there is no indication that the Supreme Court would reject them. Bravo v. United States, 577 F.3d 1324, 1325–26 (11th Cir. 2009) (per curiam) (explaining that, after Erie R.R. Co. v. Thompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), and its progeny, federal courts sitting in diversity follow intermediate state court decisions so long as there is no indication that the state high court would not agree). This process is not exact; often we must draw our decision from comparisons to analogous cases. Id. Accordingly, before we reach a decision on the public policy exception, we will first review the field of relevant precedents that guide our analysis.

16

A.

The Supreme Court of Florida has decided three cases that address the exception to the lex loci contractus rule and inform our judgment. The most recent of those is State Farm Mutual Automobile Insurance Co. v. Roach, 945 So. 2d 1160 (Fla. 2006), where the court held that Indiana residents who lived in Florida for five and one-half months every year were not entitled to application of the public policy exception because they had not shown an intent to become permanent Florida residents. Id. at 1163, 1168. Although the Roach decision turned on the second prong of the public policy exception—that is, the court held that the Indiana residents were not permanent Florida citizens in need of protection—the court also engaged in a discussion of Florida precedent applying the exception's reasonable notice prong. Id. at 1165–68. In sum, the court emphasized that it is imperative that the insurer know that the insureds are permanent residents of Florida before the "narrow" public policy exception will apply. Id. at 1168–69 (explaining that, in virtually every case in which the exception had been applied, "the insureds were permanent residents of Florida, and the insurer knew it").

As the Roach court explained, if it did not insist that an insured provide an insurer with sufficient notice of a permanent change in the insured's residence, Florida courts would find themselves in the business of "rewrit[ing] . . . out-of-state

17

contracts" such that an insured could unilaterally alter his bargain with his insurer by temporarily moving to Florida. Id. at 1169. Indeed, a contrary rule, the court warned, would "destroy the stability in contractual arrangements that the lex loci rule is designed to ensure." Id. The Roach court thus found the exception unavailing and applied New Hampshire law even though the plaintiffs called Florida home for a significant portion of every year. Id.

The facts as well as the result were essentially identical in the case upon which Roach most heavily leaned, Sturiano v. Brooks, 523 So. 2d 1126 (Fla. 1988). Sturiano also considered whether an insurer had reasonable notice that Florida law should apply to policies held by certain "snowbirds" who seasonally, but invariably, resided in Florida. Id. at 1128–30. As in Roach, the Sturiano court ultimately held that foreign law should control after applying the lex loci contractus rule, again emphasizing that "[t]o allow one party to modify the contract simply by moving to another state would substantially restrict the power to enter into valid, binding, and stable contracts." Id. at 1130. The parties to the insurance contract "bargained and paid for . . . New York law to apply," the court explained, and Florida courts would not absolve them of the burdens of that bargain. Id. (emphasis added).

By way of contrast to Roach and Sturiano, the Supreme Court of Florida decided in favor of applying the exception in Gillen v. United Services Automobile

18

<u>Ass'n</u>, 300 So. 2d 3 (Fla. 1974).[12]  There, the Gillens obtained two auto insurance policies from United Services Automobile Association ("USAA") while residents of New Hampshire.  <u>Id.</u> at 4.  Those policies were numbered "28" and "29."  <u>Id.</u> at 4–5.  The Gillens subsequently moved to Florida and informed USAA of their move.  <u>Id.</u> at 5.  While living in Florida, the Gillens sold one of their vehicles and cancelled the New Hampshire automobile policy covering that vehicle, policy number "28."  <u>Id.</u>  They then purchased a new vehicle and purchased a third policy, numbered "31," to cover that vehicle.  <u>Id.</u>  While driving the new vehicle, the Gillens were in an accident caused by an uninsured motorist.  <u>Id.</u>  The Gillens then claimed uninsured motorist benefits under both policies, "29" and "31".  <u>Id.</u>  USAA paid benefits under policy "31," but refused to do so under policy "29," relying on an "other insurance" clause found in policy "29" that permitted USAA to refuse payment of benefits whenever the claimed damage was covered by some other insurance policy owned by the insured.  <u>Id.</u>

The Gillens sued, seeking a declaratory judgment that the other insurance

---

[12]  We do not consider a fourth Supreme Court of Florida decision, <u>Strochak v. Federal Insurance Co.</u>, which was cited in <u>Roach</u>, and in which the court refused to apply the public policy exception because it found that the implicated policy had been issued and delivered while the insured was a Florida resident.  717 So. 2d 453, 455 (Fla. 1998).  That case, discussed at some length by both parties, is distinguishable from the present one insofar as it applies the <u>lex loci contractus</u> rule directly; since the contract was entered into in Florida, Florida's general choice of law rule demanded the court apply Florida law without ever considering the exception.  <u>See</u> <u>id.</u>

clause found in policy "29," while valid under New Hampshire law, was rendered invalid because Florida law, which "eliminat[es]" other insurance clauses, applied by virtue of the public policy exception. Id. at 5–6. The Supreme Court of Florida found that all three prongs of the public policy exception had been met, applied Florida law, and invalidated the other insurance clause found in policy "29." Id. at 6–7. Again, the court emphasized how important it is, in the insurance contract context, that an insured notify the insurer of a permanent change in residence with sufficient clarity so that the insurer could know that Florida law would thereafter govern the insured's policies. Id.

The Gillen court went further, however, and actually identified the facts that gave USAA reasonable notice that Florida law would control. First and most prominently, the court explained, the Gillens had purchased an insurance policy, policy number "31," after notifying USAA that they were residing in Florida. Gillen, 300 So. 2d at 6. That act, the court said, put USAA on notice that the Gillens intended to make Florida their permanent home. Id. And USAA's issuance of policy "31" "c[ould] be seen as an acknowledgment of domiciliary change." Id. Moreover, the Gillen court felt it would inequitable to permit USAA to collected Florida premiums on policy "31" and then deny the Gillens the benefit of Florida law on policy "29," stating that "[t]here is nothing in law or equity which should aid

20

an insurance company in so one-sided an arrangement." See id. (explaining that the public policy exception would apply to stop USAA from collecting premiums on both policies, but paying under only one).

Second, the court noted that it was likely that USAA knew of certain steps the Gillens had taken to establish themselves as permanent Florida residents. Aside from purchasing a family home in Florida, the Gillens had also "purchased automobile tags, [obtained] drivers' licenses, mortgaged their home in Florida and entered their children in local schools." Id. Accordingly, since USAA had acknowledged that the Gillens were permanent Florida residents subject to the protection of Florida law, USAA could not justifiably rely on a contract provision that Florida law deemed invalid.

B.

Apart from the three Supreme Court of Florida decisions, two cases from Florida's intermediate appellate courts also bear upon our decision. In the first of the two, New Jersey Manufacturers Insurance Co. v. Woodward, 456 So. 2d 552 (Fla. 3d Dist. Ct. App. 1984) (per curiam), a district court of appeal refused to apply the public policy exception where the insureds, both New Jersey residents, had purchased New Jersey policies, moved to Florida, and only provided their insurer with a "post office change-of-address form indicating that they had changed their

21

mailing address to a location in Florida." Id. at 553. The Woodward court reasoned that the insurer had no reason to know that, on those facts, the insurance risk had permanently shifted to Florid. Id. at 553–54 ("There was no indication . . . that the insureds had changed their permanent residence to Florida or that the covered motor vehicles under the subject policy would now be principally garaged in Florida."). And without clear notice of a permanent move, the insurer had no notice that Florida law would usurp New Jersey law and govern the court's interpretation of the insureds' policies. Id.

In the second of the two cases, State Farm Mutual Automobile Insurance Co. v. Davella, 450 So. 2d 1202 (Fla. 3d Dist Ct. App. 1984) (per curiam), the same district court of appeal confronted a case in which a Colorado resident informed her insurer, State Farm, that her husband had been transferred to Florida for work, and that she and her husband would be moving to Florida temporarily. 450 So. 2d at 1205 (Pearson, J., dissenting).[13] "The Davellas were hoping to stay in Florida, and thus renewed their drivers' licenses in Florida and registered [the insured vehicle] in Florida. However, they encountered problems securing [permanent] housing and a mortgage in Florida, and acknowledged the possibility that they might have to move

---

[13] We refer to the dissenting opinion only for its presentation of the facts, which is far more comprehensive than the majority's. Compare State Farm Mut. Auto. Ins. Co. v. Davella, 450 So. 2d 1202, 1205–07 (Fla. 3d Dist Ct. App. 1984) (per curiam) (Pearson, J., dissenting), with id. at 1203–05.

22

back to Colorado." Id.

While living in their temporary housing, see id. at 1205 n.2, the Davellas received notice from State Farm that their two existing insurance policies had been transferred to Florida and a bill for the increased premiums due, id. at 1205–06. Mrs. Davella then visited the nearest State Farm agent and informed him that, because the possibility existed that the Davellas would be returning to Colorado, and because three months remained on the existing Colorado policies, she and her husband did not want to transfer those policies to Florida. Id. They would instead allow their policies to be transferred if, once the policies expired, she and her husband were still living in Florida. Id.

After some confusion over which office would service the Davellas' account, the Davellas eventually renewed their Colorado policies. As the date upon which the Colorado policies would expire neared, Mrs. Davella first approached a Florida State Farm agent to purchase Florida policies. The Florida agent, however, failed to send her the policies. Accordingly, because she had not received the requested Florida policies, Mrs. Davella renewed her Colorado policies by writing directly to her Colorado agent and asking for him to "send a renewal." Id. at 1206. She also paid her premium directly to the Colorado State Farm agency (under the false impression that the agency was actually State Farm's headquarters). Id.

23

The Davellas subsequently were involved in an accident.  Id. at 1203.  They sued for declaratory judgment holding that they were entitled to the minimum policy limits mandated by Florida law ($100,000) instead of those contained in the insurance contracts ($15,000).  Id.  The trial court found for the Davellas, but the district court of appeal reversed, holding that, since Mrs. Davella choose to reject a Florida policy when it was first offered to her and renew her Colorado policies, the Davellas had not given State Farm reasonable notice that Florida law would govern their insurance contracts.  Id. at 1204.

III.

Extrapolating from the principles found in the foregoing decisions, we do not believe that the Supreme Court of Florida would choose to invoke the public policy exception on the undisputed facts related in part I, supra.  Instead, we believe that the Supreme Court would more likely hold that, because State Farm's picture of where the Duckworths' intended to permanently reside was clouded by information provided to State Farm agents by the Duckworths or otherwise discovered by State Farm, State Farm did not have reasonable notice that Florida law would govern the Duckworths' policies.

The facts related above establish the following:

(1) Anna understood that she and Aquila needed to purchase California insurance within a few months of moving to California and Maryland

24

insurance within a few months of moving to Maryland;

(2) While the Duckworths resided in California and Maryland, they nevertheless maintained close ties to Florida and possessed Florida drivers' licenses that listed a California address even though they had no intention to returning to Florida;

(3) The Duckworths decided to move to Florida and informed Whiting that they would temporarily be staying at Nikki's house in Edgewater, Florida;

(4) Anna cancelled the Duckworths' renters' insurance policy and did not purchase a new renters' insurance or homeowners' policy from State Farm once she and Aquila arrived in Florida;

(5) While temporarily staying at Nikki's house, the Duckworths maintained their California bank account and contacted Whiting in Maryland about their policies;

(6) Anna explained to Whiting and Banks that she and Aquila intended to live somewhere in Florida, but that they would not know where they would permanently settle until Aquila found a job;

(7) Anna twice had the opportunity to purchase insurance coverage while in Florida, but refused to do so because she was uncertain where she and Aquila were going to permanently settle and because the price of Florida insurance was prohibitively expensive since Aquila had yet to find a job;

(8) Anna told Whiting that, after six months of looking, Aquila had still not found a job, or, much less, a job prospect, as he was "still putting in applications all over Florida;"[14]

(9) After residing in Florida for four months, the Maryland registration on the Duckworths' motorcycle expired, so the Duckworths registered the motorcycle in Florida and obtained Florida tags for the motorcylce, but they did not register their other vehicles in Florida or obtain Florida tags for those vehicles;

(10) The Duckworths later decided to change the Probe's status from

---

[14]  There is evidence that, had Aquila lived, he would have received a job offer, and that the job offer would have come from a Florida-based company.  We do not mention it in the facts, and only briefly mention it here, because neither Aquila, nor Anna, knew that the offer was imminent, and thus could not have intended to permanently move nearer the opportunity.  Moreover, we cannot be sure that Aquila would have accepted the offer.  And since the Duckworths did not know of the offer prior to Aquila's death, Whiting and State Farm certainly cannot be charged with knowing that Aquila actually had an offer that would keep the Duckworths permanently in Florida.

"full coverage" to "nondriving"; and

(11) Neither Anna nor Aquila took any action in response to the State Farm Move Center letter informing them that they needed to transfer their policies to a Florida agent if they intended to remain in Florida permanently, but instead renewed their policies with Whiting's agency.

A reasonable observer in State Farm's position who knew of the foregoing facts would have good cause to question whether the Duckworths intended to permanently reside in Florida and whether, even if the Duckworths intended to permanently move to Florida, it was actually feasible for them to do so. State Farm had knowledge of, or could have inferred, most, if not all, of the foregoing facts and therefore had good cause to question whether the Duckworths' move to Florida was, or would be, permanent. As such, because the Duckworths' did not clearly express to State Farm that their move to Florida was permanent, State Farm did not have the reasonable notice required by the public policy exception.

Principally, in regard to the initial question of the Duckworths' intent, State Farm had knowledge of facts that would have indicated to a reasonable observer like State Farm that, even had Anna told Whiting the move to Florida was "permanent," it was still possible that the Duckworths would decide to permanently reside elsewhere. First, the only Florida address given to State Farm by the Duckworths was for Nikki's home, a home that Anna had specifically told Whiting would serve as her and Aquila's temporary, not permanent, residence. Thus, State

26

Farm had no information from which it could infer that the Duckworths had conclusively decided that their new home would be in Florida. Second, and similarly, the Duckworths had not yet purchased or rented a Florida home or purchased a homeowners' or renters' insurance policy from State Farm. Neither had they notified Florida's motor vehicles department of a change in their permanent address, as their drivers' licenses, which were on file with State Farm, still listed their prior California address. Both facts would have led a reasonable observer like State Farm to question whether the Duckworths were indeed certain that they would not ultimately reside elsewhere.

And third, though the Duckworths had registered the motorcycle in Florida and purchased a Florida license plate for that vehicle, State Farm knew, based on Anna's comments to Whiting, that they had only done so because (1) the motorcycle's Maryland registration had expired and (2) the Duckworths did not intend to return to Maryland. Thus, judging by the Duckworths' timing, as well as their decision not to register their other two vehicles in Florida, State Farm could have logically viewed that act as one of convenience rather than a declaration of their intent to become permanent Florida citizens.[15]

---

[15]  That conclusion jibes with the thrust of Fla. Stat. § 320.38, which requires that any individual who accepts employment in Florida register his vehicles with the State motor vehicles department within ten days of beginning work. Because the Duckworths did not register their motor vehicles with Florida in accordance with § 320.38, a reasonable observer might have

Moreover, are more importantly, the Duckworths had rejected an opportunity to purchase Florida coverage when it was offered to them by Banks and instead chose to renew their Maryland policies with Whiting. When viewed in conjunction with Anna's earlier proclivity to obtain local coverage from State Farm within months after arriving at a new home—not to mention her instructions to Falon to notify a State Farm agent as soon as Falon relocated to Utah—State Farm easily could have construed the Duckworths' decision to forego Florida coverage as evidence that the Duckworths did not view their move to Florida as permanent. At minimum, the fact that the Duckworths did not continue to seek insurance rate quotes after Banks told Anna to "get a[] [Florida] agent" or contact a State Farm representative after receiving the Move Center letter would have led a reasonable observer to doubt the Duckworths' resolve to permanently remain in Florida.

In other words, then, despite living at Nikki's for approximately nine months, the Duckworths had done nothing to give State Farm the clear impression that they had made permanent living arrangements in Florida. Whatever the Duckworths' subjective desires might have been, State Farm had every reason to view the Duckworths as a family in transit, capable of pulling up stakes and moving to another state at any point.

----

concluded that they did not intend to stay in Florida.

28

Next, turning to the issue of whether a permanent move to Florida was even feasible, State Farm had every reason to question whether the Duckworths had the means to make Florida their permanent home. After all, based on the Duckworths' decisions to refuse Florida coverage based on the increased premiums and to change the Probe's status to "nondriving" in order to save money on premium, State Farm must have inferred that the Duckworths' financials were, as Anna called them, "close." It is not difficult to infer from that point that the Duckworths were dependent upon Aquila to find a job that paid enough to support them; if Aquila could not find such a job in Florida, State Farm must have realized, the Duckworths would certainly have to look elsewhere. And, after learning from Anna that Aquila's job search was not going well, State Farm had to believe that there was, at minimum, a reasonable chance that the Duckworths would end up elsewhere.

In that sense, and viewing all of the foregoing facts in concert, this appeal most closely resembles State Farm Mutual Automobile Insurance Co. v. Davella, 450 So. 2d 1202 (Fla. 3d Dist Ct. App. 1984), where the public policy exception was rejected for failure of reasonable notice, than Gillen v. United Services Automobile Ass'n, 300 So. 2d 3 (Fla. 1974), the next closest on its facts and the only precedent upon which we might base a contrary holding. Unlike the Gillens, for example, the Duckworths had not taken steps that would indicate to a reasonable

29

observer that they had settled, once and for all, in Florida.  While the Gillens had a permanent home in Florida, enrolled their children in Florida schools, and registered all of their vehicles in Florida, Gillen, 300 So. 2d at 6, the Duckworths lived at a temporary address and had two vehicles still registered in Maryland.  Moreover, and more importantly, the Gillens had notified their insurer that they had a permanent home in Florida and had even purchased a Florida insurance policy for one of their vehicles, two things the Duckworths had not done.  Id.  As such, while the Gillens were paying a Florida premium and being denied the benefits of Florida law, here we have the Duckworths paying Maryland premiums and requesting Florida coverage for which they had not paid.

Instead, like the insureds in Davella, the Duckworths informed State Farm that they were moving to Florida and hoped to stay there permanently.  See 450 So. 2d at 1205.  Likewise, State Farm was aware in both cases of facts indicating that the insureds were still living in temporary housing and had no prospects for permanent housing.  Moreover, in this case as well as in Davella, State Farm knew that the insureds' plans to settle in Florida permanently were contingent upon the occurrence of an event that was not certain—or, more accurately, doubtful—to occur.  See id.  In Davella, for example, Mrs. Davella informed her agent that she and her husband were having trouble securing housing and obtaining a mortgage in

30

Florida and might have to return to Colorado unless those troubles could be resolved, id., while in this case Anna told Whiting that she and Aquila would not know where they would settle until Aquila found employment and that Aquila's job prospects were not good.

And, finally, in both cases, the insureds rejected at least one good opportunity to purchase Florida insurance and instead renewed their policies with their former agents in their former home states, the Davellas in Colorado and the Duckworths in Maryland. Based on Davella, then, the Duckworths' choice to forego Florida coverage and ignore the Move Center letter deprived of State Farm of reasonable notice. See id. at 1204. Instead, the Duckworths appeared to State Farm to be just like the insureds in New Jersey Manufacturers Insurance Co. v. Woodward, 456 So. 2d 552 (Fla. 3d Dist. Ct. App. 1984), who had only changed their mailing address to reflect the fact that they were temporarily staying in Florida. See id. at 553.

On balance, then, these Florida precedents further support our belief that the Supreme Court of Florida would decline Anna's invitation to apply the public policy exception. To apply the exception would, as the court warned against in State Farm Mutual Automobile Insurance Co. v. Roach, 945 So. 2d 1160, 1169(Fla. 2006), and Sturiano v. Brooks, 523 So. 2d 1126, 1129–30 (Fla. 1988), threaten the stability of contracts, the very principle at the core of Florida's lex loci rule. Florida

31

law, as explained by these precedents, does not permit an insured to unilaterally alter his bargain with his insurer without reasonable notice. The Duckworths paid Maryland premiums for Maryland coverage, and we, like the Florida courts, cannot absolve them of the burdens of their bargain.

IV.

For the reasons stated above, and based on the totality of the circumstances, we conclude that, even if Anna had told Whiting that the Duckworths move to Florida was "permanent," the Duckworths nonetheless failed to clearly demonstrate to State Farm that they had become permanent Florida citizens. For this reason, judgment as a matter of law is proper: absent reasonable notice, the public policy exception is inapplicable and, as the district court concluded, State Farm is entitled to declaratory relief. The district court's grant of summary judgment in favor of State Farm, therefore, is

AFFIRMED.

CARNES, Circuit Judge, dissenting:

Summary judgment should be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. But it is often tempting for a district court judge to grant, and for appellate judges to affirm, summary judgment even when there is conflicting evidence on a material issue. The temptation is for the judge to take on the task of finding facts and enter judgment based on what the judge believes a jury should find. By affirming the grant of summary judgment in this case, the majority follows the maxim of Lord Henry Wotton in Oscar Wilde's The Picture of Dorian Gray: "The only way to get rid of a temptation is to yield to it."[1]

The majority opinion is wrong to conclude that, after drawing all reasonable inferences in Anna Duckworth's favor, no reasonable factfinder could find from the evidence that the Duckworths gave State Farm reasonable notice that they had permanently moved to Florida. The conclusion is wrong for a number of reasons, chief of which is Anna Duckworth's testimony that she unequivocally told State Farm's agent that she and her husband were permanently moving to Florida. That fact—and we are required to accept it as a fact for summary judgment purposes—the majority simply dismisses as "immaterial." Maj. Op. at 11 n.7. But

---

[1]Oscar Wilde, The Picture of Dorian Gray 35 (Signet Classic 1962) (1890).

33

that fact is anything but immaterial. There can be no more material fact about whether Anna Duckworth put State Farm on notice that she and her husband were moving to Florida permanently than the fact that she told State Farm they were moving to Florida permanently.

## I.

The majority opinion states that even assuming, as it must at this stage, that Anna Duckworth told State Farm's Agent Whiting that she and her husband were permanently moving to Florida, "State Farm still had valid reason to doubt that the Duckworths intended to permanently reside in Florida." Maj. Op. at 11 n.7. It argues that "[a] reasonable observer in State Farm's position . . . would have good cause to question whether the Duckworths intended to permanently reside in Florida," and "even had Anna told Whiting the move to Florida was 'permanent,' it was still possible that the Duckworths would decide to permanently reside elsewhere." Maj. Op. at 26. It insists that the Duckworths' "later actions overwhelmingly indicated to State Farm that [their] move to Florida was not necessarily permanent." Maj. Op. at 5–6.

While all of that might be proven true at a trial, none of it matters at the summary judgment stage, which is where we are. There is no support in the governing substantive law of Florida or in our summary judgment law for the

proposition that judgment can be granted on the factual issue of notice of the insured's intent because an insurer has "valid reason to doubt" an insured's unequivocal statement of intent, because an insurer has "good cause to question" if the insured will carry out the stated intent, because it is "still possible" that an insured could change her intent, or because later actions indicated that the move "was not necessarily permanent."

The rule is that "[s]ummary judgment should be granted only when the evidence produced by the nonmoving party, when viewed in a light most favorable to that party, fails to establish a genuine issue." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). "If one or more of the essential elements is in doubt, then summary judgment must not be granted." Id. at 952. All a non-moving party must do to avoid summary judgment is show a disputed issue of material fact.

"Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence. It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). In other words, in determining whether a genuine issue of material fact remains at this stage of the

35

proceedings, "[n]either we nor the district court are to undertake credibility determinations or weigh the evidence." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010); cf. Norelus v. Denny's, Inc., 628 F.3d 1270, 1293 (11th Cir. 2010) ("[A]s everyone knows, appellate courts may not make fact findings."). That, however, is exactly what the district court did in granting summary judgment to State Farm and what the majority has done in affirming it.

A.

At her deposition, Anna Duckworth testified as follows:

Q:    And did you tell [the Maryland agent] that that was going to be a permanent change of address for you?

A:    I told her that we were permanently moving to the State of Florida, I just wasn't sure where we were going to live in Florida. She was also informed that [the new address] was my daughter's home and that I would notify her when we decided where in Florida we were going to live.

Q:    All right. And you specifically recall telling her that you were going to find other residence someplace in the State of Florida other than your daughter's residence?

A:    Yes.

Q:    Did you suggest or indicate to her that you were going to be staying temporarily with your daughter?

A:    Temporarily with my daughter, yes. Permanently in the State of Florida.

Q:    And you—as you sit here today, you recall that specific

36

statement that, I am permanently living in Florida effective May whatever date, 2006?

A:     Yes.

In order to conclude that State Farm did not have reasonable notice that the Duckworths had permanently moved to Florida, one would have to disbelieve Anna Duckworth's deposition testimony that she specifically told her State Farm agent in Maryland that even though her address in Florida was temporary, the move to Florida was permanent.  And that is exactly what the majority does—disbelieve the testimony—even though courts are not authorized at the summary judgment stage to believe or disbelieve testimony.[2]

The majority rejects Anna Duckworth's testimony as "immaterial" because, it finds as a fact that the Duckworths' "later actions overwhelmingly indicated to State Farm that [their] move to Florida was not necessarily permanent."  Maj. Op. at 5–6. But at the summary judgment stage courts, including appellate courts, have no business making fact findings.

In a squid-like attempt to cover its move into the jury box, the majority

---

[2]After making that credibility determination, the majority analogizes the present case to one in which "the insured advised the company on several occasions that her move to Florida was temporary and that she wanted to keep her Colorado policy intact."  State Farm Mut. Auto. Ins. Co. v. Davella, 450 So. 2d 1202, 1204 (Fla. 3d DCA 1984); see Maj. Op. at 30–31.  The analogy, of course, does not fit.  Anna Duckworth did not tell the insurance company that the move to Florida was temporary, but just the opposite. Opposites are not analogous, but just the opposite.

37

opinion throws up a cloud of ink composed of lesser facts in an effort to mask its unauthorized rejection of the primary fact that State Farm was told that the Duckworths' move to Florida was permanent. See Maj. Op. at 24–26. The majority's list of facts is incomplete. Among the facts that the majority acknowledges earlier in its opinion but fails to include in its list of those relevant to the critical issue of notice are these:

(1) "In July 2006 . . . Anna called Whiting to inform her that the motorcycle's California registration had expired, that Aquila had registered the motorcycle in *Florida*, and that the motorcycle had a new *Florida* license plate." Maj. Op. at 12.

(2) "In response to Anna's call, Whiting sent Anna new proof-of-insurance cards" to the Duckworths' *Florida* address. Maj. Op. at 12.

(3) "In November 2006, Anna again called Whiting, . . . and Anna told her that Aquila was 'still putting in applications all over *Florida*.'" Maj. Op. at 12–13.

(4) Anna testified that when she declined to obtain new policies from Debbie Banks through the Charlie Cobb State Farm agency, Debbie advised her to "[w]ait until you get settled, [because] insurance rates in Volusia County [*Florida*] are higher than anywhere else [in *Florida*]."[3] Doc. 28–2 at 97; see Maj. Op. at 11–12, 12 n.8.

(5) "[O]n November 9, 2006, Anna faxed Whiting a typed

---

[3]Crediting Anna Duckworth's testimony and drawing all reasonable inferences in her favor, we have to infer that Debbie Banks meant that "insurance rates in Volusia County are higher than anywhere else" in Florida, thereby implying that Banks, an agent of State Farm, was aware of the Duckworths' intentions to reside permanently somewhere in Florida.

38

> confirmation of the request that listed Nikki's [*Florida*] address as their place of residence." Maj. Op. at 13.

(emphasis added).

Despite all of those facts, and Anna Duckworth's own unequivocal testimony that she specifically told State Farm Agent Whiting that the Duckworths were permanently moving to Florida, the majority nevertheless insists on pretending that "State Farm had *no information* from which it could infer that the Duckworths had conclusively decided that their new home would be in Florida." Maj. Op. at 26–27 (emphasis added). Summary judgment ought not be based on the pretended absence of evidence.

Faced with conflicting evidence, a reasonable trier of fact could conclude that the Duckworths put State Farm on reasonable notice that their move to Florida was permanent, or it could conclude, as the majority acting as a factfinder does, that their inconsistent actions "overwhelmingly indicated to State Farm that the Duckworths' move to Florida was not necessarily permanent." Maj. Op. at 5–6. Because reasonable minds could differ in their ultimate conclusions based on the disputed and undisputed material facts, a trier of fact—not the district court on a motion for summary judgment and not a majority of this Court—should weigh the conflicting evidence and make a fact finding about whether State Farm had reasonable notice that the Duckworths' move was permanent.

39

B.

Because of its decision against Anna Duckworth on the reasonable notice issue, the majority does not reach the citizenship requirement of Florida's public policy exception to its *lex loci contractus* rule. Because I disagree with the majority on the reasonable notice issue, I will address it. The requirement means that in order to get past summary judgment, Anna Duckworth must have created a genuine issue of material fact that the Duckworths were "in the process of establishing themselves as permanent residents" of Florida. See Gillen v. United Servs. Auto. Ass'n, 300 So. 2d 3, 6 (Fla. 1974). I conclude that Anna Duckworth's testimony along with other undisputed facts create a genuine issue about that, so that the district court was also precluded from granting summary judgment to State Farm on the citizenship requirement.

The following evidence created a genuine issue about whether the Duckworths were actually in the process of establishing themselves as permanent residents of Florida at the time of the accident:

(1)   Anna had full-time employment in Florida;

(2)   Aquila had part-time employment in Florida;

(3)   both Aquila and Anna were actively seeking long-term employment in Florida;

(3)   one of the Duckworths' three vehicles (the Yamaha motorcycle)

40

was registered in Florida;

(4)    Aquila had obtained a concealed weapons permit in Florida;

(5)    Aquila joined the American Legion in Florida;

(6)    the Duckworths had opened a bank account in Florida;

(7)     the Duckworths had Florida drivers licenses that predated their move to California;

(8)    the Duckworths had Florida voter registration cards (which had expired)

(9)    the Duckworths filed income tax returns as Florida residents.[4]

There was, to be sure, evidence weighing against a finding that the Duckworths actually were permanent Florida residents, including: their temporary living arrangements with Anna's daughter (in Florida); the Cavalier vehicle had a Maryland title and was registered in Maryland; the Probe vehicle was registered in California with a Maryland address on the title; the Florida driver's licenses at the time of the accident listed the Duckworths' California address; their voter registrations had expired before they returned to Florida, and neither one had voted in a Florida election after 1998 when they left Florida to move to California. The conflicting evidence on the issue of Florida citizenship should be weighed by a

---

[4] Anna Duckworth asserts in her brief that she and her husband filed their income tax returns as Florida residents. Because Florida has no state income tax, we assume that she means they listed a Florida address on their federal income tax returns. Even though there is no record citation for the assertion, State Farm's brief does not dispute it.

41

trier of fact and not resolved by a court. Summary judgment on the issue is not appropriate, and we ought to reverse.